# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Democratic National Committee; North Carolina Democratic Party,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>North Carolina State Board of Elections; Karen Brinson Bell, *in her official capacity as Executive Director of the North Carolina State Board of Elections*; Alan Hirsch, *in his official capacity as Chair of the North Carolina State Board of Elections*; Jeff Carmon, *in his official capacity as Secretary of the North Carolina State Board of Elections*; and Stacy Eggers IV, Kevin N. Lewis, and Siobhan O'Duffy Millen, *in their official capacities as members of the North Carolina State Board of Elections*,<br><br>　　　　　　　　Defendants. | Case No.  1:23-CV-862<br><br><br><br>**<u>COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.　　The right to vote "'is a fundamental matter in a free and democratic society,'" and a right that is "'preservative of other basic civil and political rights.'" *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964)).  Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Accordingly, "[i]t has been repeatedly recognized that all qualified voters have a

constitutionally protected right to vote and to have their votes counted." *Reynolds*, 377

U.S. at 554 (citation omitted).  In short, "voting is of the most fundamental significance

under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

2.     North Carolina Senate Bill 747 ("S.B. 747"), which became law today, is a

direct assault on the "most fundamental" right to vote. *Burdick*, 504 U.S. at 433.  In fact,

despite its innocuous-sounding name, "An Act to Make Various Changes Regarding

Elections Law," S.B. 747 (which is attached as Exhibit A) is designed to undermine the

right to vote in North Carolina.  The changes it adopts would make it much harder for

some North Carolinians to register to vote, would allow ballots by same-day registrants to

be rejected without any notice to the voter or any right to challenge the rejection, would

permit an influx of intimidating and largely unconstrained poll observers into voting

places, and would require the discarding of absentee ballots that are returned even a

minute after the polls close on election day (no matter how far in advance of the election

voters place their ballots in the mail).  The U.S. Constitution, the North Carolina

Constitution, and multiple federal statutes prohibit these myriad efforts at vote

suppression, which will disenfranchise many North Carolinians.

3.     Under S.B. 747, any individual who wishes to both register to vote and vote

early on the same day—a so-called "same-day registrant"—must produce documentation

that all other registrants in North Carolina need not.  And even if a same-day registrant

produces that documentation, his or her application to register will *still* be rejected—and

his or her ballot will be retrieved and discarded—if a single verification notice sent to the

address the registrant provides is returned by the U.S. Postal Service (mistakenly or not) as undeliverable.  By contrast, the registration applications submitted by non-same-day registrants in North Carolina cannot be rejected unless *two* separate verification notices are returned as undeliverable.  S.B. 747 also does not require election officials to try to notify a same-day registrant that his or her application was rejected and that the accompanying ballot will thus be retrieved and discarded.  Nor does it establish any mechanism for the registrant to challenge the rejection as erroneous.  This again is different from the rule for non-same-day registrants, who may generally appeal adverse determinations to county boards of elections.

4.     There is more.  For North Carolina voters who need or prefer to vote by mail—as so many do—S.B. 747 requires discarding (i.e., not counting) any absentee ballot that is not received by 7:30 p.m. on election day, eliminating the statutory grace period North Carolina has provided permitting absentee ballots postmarked by election day to be received up to three days after election day.  This change cannot be justified as a way to ensure that election results are determined by election night (or very soon thereafter), because S.B. 747 simultaneously extends the window for *challenging* absentee ballots to five days *after* election day, abandoning the prior requirement that such challenges be made by 5:00 p.m. on election day.  The legislature has thus perversely given *less* time to those who seek to exercise their fundamental right to vote and *more* time to those who seek to deny it.

5.      The North Carolina General Assembly passed S.B. 747 strictly along party lines, without any legislative reports justifying its voting restrictions.  Plaintiffs are not aware, for example, of *any* instances of actual voter fraud, whether cited by North Carolina legislators or otherwise, that warranted S.B. 747's restrictive measures—even indulging the dubious assumption that the measures would deter or prevent such fraud.

6.      Governor Roy Cooper vetoed S.B. 747, stating in his veto message that the bill "has nothing to do with election security and everything to do with Republicans keeping and gaining power."  *Governor Roy Cooper Objections and Veto Message*.[1]  S.B. 747 seeks to accomplish that objective, the governor elaborated, by "erect[ing] new barriers for younger and non-white voters, many of whom use early voting and absentee ballots."  *Id.*  At the same time, the law "hurts older adults, rural voters and people with disabilities."  *Id.*  Put simply, S.B. 747 attempts to "block voters and their ballots unnecessarily."  *Id.*

7.      On October 10, 2023, the North Carolina General Assembly overrode Governor Cooper's veto, again strictly along party lines (and with barely the three-fifths threshold required).  In light of the override, S.B. 747 is now or will soon become the law in North Carolina:  Some provisions are slated to become effective on December 1, 2023; January 1, 2024; and July 1, 2024.  S.B. 747 §§37.(b), 44.(f), 50.  The rest take effect as

---

[1] https://webservices.ncleg.gov/ViewBillDocument/2023/7138/0/S747-BILL-NBC-11326 (visited October 10, 2023).

of the date of the law's enactment.  *Id.* §50.  S.B. 747 therefore poses an urgent problem for many eligible individuals in North Carolina who wish to exercise their right to vote.

8.     S.B. 747's voting restrictions are unconstitutional.  For example, the law violates the First and Fourteenth Amendments to the U.S. Constitution, which bar States from adopting procedures that unduly burden the right to vote (or even create an unreasonable *risk* of erroneous deprivations of voting rights).  S.B. 747 unduly burdens North Carolinians' right to vote in several ways.  First, for same-day registrants, S.B. 747 imposes new requirements to provide highly specific documentation to register, directs election officials to retrieve and discard a ballot if the Postal Service returns a single verification notice as undeliverable, and fails to provide any mechanism to challenge adverse determinations.  These provisions are not justified by any sufficient state interest, and they will deny eligible voters their fundamental right to cast ballots and have those ballots counted.  Second, S.B. 747 forces voters to endure encounters with intimidating and unconstrained poll observers in order to cast their ballots in person.  And third, S.B. 747 arbitrarily *reduces* the window in which voters can cast absentee ballots, requiring such ballots to be received by 7:30 p.m. on election day, even if postmarked before that day—while at the same time *lengthening* the period in which challenges to absentee ballots can be made.

9.     S.B. 747 also violates the Due Process Clause.  The statute provides no process for same-day registrants to contest erroneous rejections of their applications and ballots, and it establishes a system in which a registration application is denied—and

- 5 -

hence any ballot the person has cast is not counted—if a county board or the Postal Service makes a single mistake resulting in the improper return of a verification notice as undeliverable, again without any notice to the affected voter that his or her application was denied or any mechanism to dispute any administrative error in the denial.

10.     For similar reasons, S.B. 747 violates the North Carolina Constitution's Law of the Land Clause, by depriving individuals of their right to vote without adequate notice and an opportunity to be heard.  Moreover, S.B. 747 violates the North Carolina Constitution's Free Elections Clause by permitting poll observers to interfere with and intimidate voters.

11.     In addition to being unconstitutional, S.B. 747 violates multiple federal statutes.

12.     First, it violates the Civil Rights Act ("CRA"), which prohibits officials from applying different voting-registration standards, practices, or procedures to different groups of individuals in the same county.  S.B. 747 does exactly that, applying different standards and procedures to same-day registrants than to non-same-day registrants in each county.

13.     S.B. 747's provisions for same-day registration and voting also violate the Help America Vote Act ("HAVA").  HAVA requires that election officials establish a free tracking system for provisional ballots and provide those who cast provisional ballots with written notice of the system.  S.B. 747 fails to establish any system by which same-day registrants may track whether their ballots are ultimately counted, and it therefore

also fails to require written information about such a system to be given to same-day registrants after they vote.

14.     Finally, S.B. 747 violates the Voting Rights Act ("VRA"), which prohibits anyone from intimidating voters or attempting to do so.  In derogation of this provision, S.B. 747 allows voting places to be flooded with poll observers who can engage in intrusive conduct.

15.     Given the multiple infirmities with the challenged provisions of S.B. 747, and because those provisions will inflict irreparable harm by denying North Carolinians their fundamental constitutional right to vote, this Court should declare the challenged provisions unlawful and enjoin their enforcement.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction under 28 U.S.C. §1331, as this action arises under the U.S. Constitution and three federal statutes: the CRA, HAVA, and the VRA.  This Court also has subject-matter jurisdiction under 28 U.S.C. §1343(a), as plaintiffs seek equitable relief for protection of the right to vote.  And the Court has jurisdiction over the CRA claim under 52 U.S.C. §10101(d).

17.     Under 28 U.S.C. §1367, this Court has supplemental jurisdiction over the state constitutional claims because those claims form part of the same case or controversy as the federal claims.

18.     This Court has personal jurisdiction over the North Carolina State Board of Elections, which is a state agency in North Carolina.

- 7 -

19.     This Court has personal jurisdiction over Executive Director Karen Brinson Bell, Chair Alan Hirsch, Secretary Jeff Carmon, Stacy Eggers IV, Kevin N. Lewis, Siobhan O'Duffy Millen, as they are sued in their official capacities as appointed officials in North Carolina.  Each also works and resides in North Carolina.

20.     Venue in this Court is proper under 28 U.S.C. §1391(b).  Among other things, a substantial portion of the violations outlined in this complaint have occurred or will occur in this district.

21.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§2201-2202.  The Court also has authority to enter a declaratory judgment and provide preliminary and permanent injunctive relief under Federal Rules of Civil Procedure 57 and 65.

## PARTIES

22.     The Democratic National Committee ("DNC") is the oldest continuing party committee in the United States.  It is a "national committee" as that term is defined in 52 U.S.C. §30101(14), with a principal place of business at 430 South Capitol Street S.E., Washington, D.C. 20003.

23.     The DNC's organizational purposes and functions are to communicate the Democratic Party's position and messages on issues; protect the legal rights of voters; and aid and encourage the election of Democratic candidates at the national, state, and local levels, including by persuading and organizing citizens not only to register to vote as Democrats, but also to cast their votes for Democratic candidates.

- 8 -

24.     The DNC is composed of the chair, vice chairs, and over 200 members elected by Democrats in every U.S. state and territory, plus the District of Columbia.

25.     The North Carolina Democratic Party ("NCDP") is a state committee, as that term is defined by 52 U.S.C. §30101.  NCDP's purpose is to elect Democratic candidates to public office throughout North Carolina.  To accomplish that purpose, NCDP supports Democratic candidates in national, state, and local elections through fundraising and organizing efforts; protects the legal rights of voters; and ensures that all voters can cast ballots in North Carolina, including absentee ballots.  NCDP has members and other constituents throughout North Carolina, including many voters who regularly support and vote for candidates affiliated with the Democratic Party.

26.     There are over 2.4 million registered members of the Democratic Party in North Carolina.  *See* Voter Registration Statistics.[2]  It is exceedingly likely that one or more members of NCDP, or other individuals who would vote for Democratic candidates in North Carolina, will be removed from the voting rolls or otherwise prevented from voting because of S.B. 747.  The DNC and NCDP can obtain relief on behalf of such voters without their individual participation.  The DNC and NCDP thus bring the claims below as well as on behalf of their members and other individuals who would vote for Democratic candidates in North Carolina and will be harmed by S.B. 747's burdens on the right to vote and unlawful treatment of voters.

---

[2] https://vt.ncsbe.gov/RegStat/Results/?date=09%2F09%2F2023 (visited October 10, 2023).

Case 1:23-cv-00862   Document 1   Filed 10/10/23   Page 9 of 37

27.     S.B. 747 also directly harms the DNC and NCDP as organizations, and thus they sue as well on their own behalf.  The law will require each organization to expend and divert funds and resources that they would otherwise spend on voter outreach and mobilization efforts toward informing and educating voters about their rights under the First and Fourteenth Amendments to the U.S. Constitution, article I of the North Carolina Constitution, the CRA, HAVA, and the VRA, in order to ensure that those voters are not erroneously prevented from voting.  The likely erroneous denial of Democratic voters' right to cast a ballot and have it counted further injures the DNC and NCDP, by reducing the number of registered Democrats able to vote in North Carolina, thus undermining the two organizations' abilities to succeed in getting Democrats elected.

28.     The North Carolina State Board of Elections ("NCSBE") is the state agency with "general supervision over the primaries and elections in the State."  N.C. Gen. Stat. §163-22.  NCSBE is "the state agency charged with the administration of the elections process and campaign finance disclosure and compliance."  About NCSBE.[3]  NCSBE "works in conjunction with county boards of elections" throughout North Carolina "to ensure that elections are conducted lawfully and fairly."  Id.[4]

29.     Karen Brinson Bell is NCSBE's executive director.  As North Carolina's "Chief State Election Official," N.C. Gen. Stat. §163-82.2, she is tasked with

_____

[3] https://www.ncsbe.gov/about (visited October 10, 2023).

[4] The General Assembly today also overrode Governor Cooper's veto of S.B. 749, which will, when it takes effect, reconstitute the NCSBE.  This legislation achieves exactly what North Carolina's voters rejected in a 2018 referendum.

- 10 -

"administering elections," "overseeing 100 county boards of elections," and "ensuring voting for more than 7 million voters." About NCSBE, *supra* n.3. She is sued in her official capacity.

30. Alan Hirsch is NCSBE's chair. He resides in Chapel Hill, North Carolina, and is sued in his official capacity.

31. Jeff Carmon is NCSBE's secretary. He resides in Snow Hill, North Carolina, and is sued in his official capacity.

32. Stacy Eggers IV is an NCSBE member. He resides in Boone, North Carolina, and is sued in his official capacity.

33. Kevin N. Lewis is an NCSBE member. He resides in Rocky Mount, North Carolina, and is sued in his official capacity.

34. Siobhan O'Duffy Millen is an NCSBE member. She resides in Raleigh, North Carolina, and is sued in her official capacity.

## FACTUAL ALLEGATIONS

*Registration and Voting in North Carolina Before S.B. 747*

35. In North Carolina, "[e]very person born in the United States and every person who has been naturalized," is "18 years of age," and meets certain qualifications "shall be entitled to vote at any election." N.C. Const. art. VI, §1. To be eligible to vote in a certain county, voters must generally reside there. N.C. Gen. Stat. §163-55(a). And to vote in person, voters must "present photographic identification." N.C. Const. art. VI, §§2(4), 3(2).

36.     North Carolina law includes various provisions governing voter registration, one-stop voting, and absentee voting.

37.     An individual must register before he or she can vote in North Carolina. N.C. Const. art. VI, §3(1); N.C. Gen. Stat. §§163-54, 163-82.1(a).  The registration form asks an applicant to provide various pieces of information, including his or her name, residential address, county of residence, and political party affiliation (if any).[5]  An applicant must also answer questions to ensure that he or she is old enough to vote and a U.S. citizen.  N.C. Gen. Stat. §163-82.4(e).  And election officials can ask an applicant for any other "information the [NCSBE] finds is necessary to enable officials of the county where the person resides to satisfactorily process the application."  *Id.* §163-82.4(a).

38.     When an applicant fills out the registration form, he or she is not required to present any specific documentation verifying his or her eligibility to vote.  Rather, the applicant must sign an attestation under penalty of perjury that he or she meets all the requirements to register.  N.C. Gen. Stat. §163-82.4(c)(1).  Registration forms typically must be submitted no later than 25 days before the election in which the applicant would like to vote.  *See id.* §163-82.6(d).[6]

---

[5] https://s3.amazonaws.com/dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06 W.pdf (visited October 10, 2023).

[6] If an individual becomes eligible to vote after the standard registration deadline, the person may register on election day by completing the registration form and submitting it to an election official.  N.C. Gen. Stat. §163-82.6(f).  If the official denies

39.     When a county board of elections receives an application to register to vote, the board either tentatively determines that the applicant is qualified to vote at the given address or determines that the applicant is not qualified to vote at the given address.  N.C. Gen. Stat. §163-82.7(a).  If a board tentatively determines that an applicant is qualified to vote at the given address, it "shall send a notice to the applicant, by nonforwardable mail, at the address the applicant provide[d] on the application form."  *Id.* §163-82.7(c).  If the U.S. Postal Service does not return the verification notice to the board as undeliverable, then "the county board shall register the applicant to vote."  *Id.* §163-82.7(d).  If the Postal Service does return the notice to the board as undeliverable, then "the county board shall send a second notice by nonforwardable mail to the same address to which the first was sent."  *Id.* §163-82.7(e).  If the second notice is not returned to the county board as undeliverable, then the board "shall register the applicant to vote."  *Id.*  If the second verification notice is returned to the board as undeliverable, then the board "shall deny the application" and "need not try to notify the applicant further."  *Id.* §163-82.7(f).

40.     If a county board determines that an applicant is not qualified based on his or her application to register, then the board "shall send, by certified mail, a notice of denial of registration."  N.C. Gen. Stat. §163-82.7(b).  An applicant who wishes to dispute the denial of the registration may appeal to the county board within five days.  *Id.*; *see also id.* §163-82.18(a).  The board must conduct a public hearing on any such

---

the application, the newly eligible voter may still vote a challenged ballot and appeal the denial to the county board of elections.  *Id.*

appeal. *Id.* §163-82.18(b). An applicant whose application is denied after such a hearing may appeal to the North Carolina Superior Court within ten days of the board's post-hearing denial. *Id.* §163-82.18(c). If the applicant is dissatisfied with the outcome in superior court, the applicant may appeal to North Carolina appellate courts. *Id.*

41.     North Carolinians can both register and vote on the same day (before election day) at what was (before S.B. 747) called a "one-stop" voting site in their county of residence. *See* N.C. Gen. Stat. §163-227.6; *see also* Vote Early in Person.[7] Those who sought to register and vote on the same day (before election day) were required both to attest to their eligibility to vote, by filling out a registration application, and to provide proof of residence. *See* Register in Person During Early Voting.[8] Anyone who was "eligible to vote by absentee ballot" could obtain and fill out an application for an absentee ballot and then vote at a one-stop voting site. N.C. Gen. Stat. §163-227.2(a). In turn, *every* "qualified voter is authorized to vote by absentee ballot" in North Carolina elections. *Id.* §163-226. Thus, any eligible North Carolina voter could vote at a one-stop voting site. Each site was required to be open during certain hours leading up to election day. *Id.* §163-227.6(c).

42.     For North Carolinians who preferred to return their completed absentee ballots by mail, before S.B. 747, those ballots were counted as long as they were

_____

[7] https://www.ncsbe.gov/voting/vote-early-person (visited October 10, 2023).

[8] https://www.ncsbe.gov/registering/how-register/register-person-during-early-voting (visited October 10, 2023).

- 14 -

postmarked by election day and "received by the county board of elections not later than three days after the election by 5:00 p.m." N.C. Gen. Stat. §163-231(b)(2)(b).

43.    Generally, any person registered to vote in the same precinct as an absentee voter could challenge that absentee voter's ballot between noon and 5:00 p.m. on election day. N.C. Gen. Stat. §163-89(a)-(b). For absentee ballots that were postmarked by election day but received within the three-day window after election day, *see id.* §163-231(b)(2)(b), challenges were permitted between "noon on the day following the election and no later than 5:00 p.m. on the next business day following the deadline for receipt of such absentee ballots," *id.* §163-89(a).

44.    Before S.B. 747, each political party was entitled to designate election observers to watch the polls on election day. Specifically, each party could designate two observers per voting place, plus an additional ten at-large observers per county who could go to any voting place in the county, and an additional hundred at-large observers who could go to any voting place in the state. N.C. Gen. Stat. §163-45(a). No more than three observers from the same party were permitted in any one voting enclosure at the same time. *Id.* Observers were not permitted to "impede the voting process or interfere or communicate with or observe any voter in casting a ballot." *Id.* §163-45(c). They carried out their functions from a specific place in the voting enclosure designated by election officials. *See* Tips for Monitoring or Observing the Election at Polling Sites.[9]

---

[9] https://www.ncsbe.gov/about-elections/election-security/tips-monitoring-or-observing-election-polling-sites (visited October 10, 2023).

45. S.B. 747 restricts North Carolinians' right to vote in several ways.

46. To start, S.B. 747 changes the procedure for same-day registration and voting. For same-day registration under S.B. 747, an individual must: (1) "[c]omplete a voter registration application form," (2) "[p]rovide proof of residence by presenting a HAVA document listing the individual's current name and address," and (3) "[p]resent photo identification." S.B. 747 §10.(a) (to be codified at N.C. Gen. Stat. §163-82.6B(b)). A "HAVA document" is any of the following: (1) a "current utility bill," (2) a "current bank statement," (3) a "current government check," (4) a "current paycheck," (5) "[a]nother current government document," or (6) a "current document issued from the institution who issued the photo identification shown by the voter." *Id.* (to be codified at N.C. Gen. Stat. §163-82.6B(e)). If an election official rejects an individual's application based on allegedly deficient documentation, S.B. 747 is silent as to whether or how the individual can be heard on a challenge to that rejection.[10]

47. An individual who uses the new procedures for same-day registration does not cast a regular ballot but instead can cast only "a retrievable ballot." S.B. 747 §10.(a) (to be codified at N.C. Gen. Stat. §163-82.6B(c)). After such an individual submits his or

---

[10] S.B. 747 also makes a variety of seemingly stylistic changes to North Carolina's elections laws. For example, S.B. 747 deletes references to "one-stop voting" and replaces them with references to "early voting." *See* S.B. 747 §20 (to be codified at N.C. Gen. Stat. §163-165(5g)). But nomenclature aside, the function of both one-stop and early voting is the same: to permit eligible North Carolina voters to submit their ballots before election day.

her application under the new same-day-registration procedures (and votes a retrievable ballot), the appropriate county board of elections must work with NCSBE to verify the individual's identity.  *Id.* (to be codified at N.C. Gen. Stat. §163-82.6B(d)).  "The applicant's vote shall be counted unless the county board determines that the applicant is not qualified to vote[.]"  *Id.*  As part of that process, the board must send a verification notice to the same-day registrant's address.  If the U.S. Postal Service, before the close of business on the business day before canvass, returns that lone verification notice as undeliverable, "the county board shall not register the applicant and shall retrieve the applicant's ballot and remove that ballot's votes from the official count."  *Id.*

48.     S.B. 747 does not provide a mechanism for notifying same-day registrants that they have been deemed ineligible to register and vote—and hence that any ballot they already cast will be retrieved and discarded.  Nor does S.B. 747 provide same-day registrants an opportunity to contest (i.e., to be heard on) that adverse determination, even though it results in the immediate—and automatic—removal of their ballots from the official count.

49.     S.B. 747 also alters the deadline by which absentee ballots must be returned to be counted.  Now, it is not sufficient for an absentee ballot to be *postmarked* by election day and received by the county board of elections no later than 5:00 p.m. three days after the election.  Rather, absentee ballots must now be *received* by 7:30 p.m. on election day.  S.B. 747 §35 (to be codified at N.C. Gen. Stat. §163-231(b)(1)).  That deadline will be extended only if dictated by federal law or if the closing time of the polls

throughout the county is extended. *Id.* (to be codified at N.C. Gen. Stat. §163-231(b)(2)). If an absentee ballot is received by the county board even a minute after the closing of the polls on election day, that ballot will be discarded, even if it is postmarked days earlier and the delay is entirely attributable to the Postal Service.

50. At the same time as S.B. 747 *reduces* the time for North Carolina voters to return their absentee ballots by mail, it *increases* the time for challenging such ballots. Specifically, S.B. 747 provides that "[t]he absentee ballot of any voter received by the county board of elections" before 7:30 p.m. on election day "may be challenged no later than 5:00 P.M. on the *fifth business day* after the … election[.]" S.B. 747 §15 (to be codified at N.C. Gen. Stat. §163-89(a)) (emphasis added). Anyone who is registered to vote in the same *county* as the absentee voter (not just the same *precinct*) may now challenge an absentee ballot. *Id.* (to be codified at N.C. Gen. Stat. §163-89(b)). When a county board of elections resolves any such challenge, its decision may be appealed to the superior court in that county within ten days. *Id.* (to be codified at N.C. Gen. Stat. §163-89(c)).

51. Finally, S.B. 747 empowers poll observers to engage in more intrusive conduct in voting places. Most notably, observers are now permitted to "[m]ov[e] about the voting place," with few if any clear limits. S.B. 747 §7.(b) (to be codified at N.C. Gen. Stat. §163-45.1(g)).

- 18 -

## CLAIMS FOR RELIEF

### Count I: Violation of the First and Fourteenth Amendments to the United States Constitution – Undue Burden on the Fundamental Right to Vote

52.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

53.     State laws that burden the right to vote violate the First and Fourteenth Amendments to the U.S. Constitution unless relevant and legitimate state interests of sufficient weight justify the burdens.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788-790 (1983); *Burdick*, 504 U.S. at 434.  The more severely a law burdens the right to vote, the more strictly it must be scrutinized.  Hence, "election laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are 'narrowly drawn to advance a state interest of compelling importance.'"  *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (quoting *McLaughlin v. North Carolina Board of Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995)); *see also Burdick*, 504 U.S. at 434.

54.     S.B. 747 imposes multiple severe burdens on North Carolinians' right to vote, with no sufficient justification.

55.     *First*, S.B. 747's same-day-registration provisions severely burden the right to vote in North Carolina in several ways.

56.     S.B. 747 §10.(a) requires a same-day registrant to provide *both*: (1) photo identification, and (2) proof of residence shown in a "HAVA document" that lists the individual's current name and residence address.  For many individuals, that burden will be insurmountable.  In particular, students, young voters, elderly voters, low-income

voters, and voters of color may have more difficulty producing documentation verifying their addresses. For example, a student who moved into an off-campus apartment not long before an election (but long enough to be eligible to vote in the relevant county) may not have the necessary documentation if her utility bills are in a roommate's or her landlord's name. And some individuals in communities that have a higher prevalence of multigenerational households may not have utility bills listing their names.[11] As a result, S.B. 747's documentation requirement for same-day registrants may prevent eligible people from registering and voting at all, which is the most serious burden on the right to vote. The requirement to produce both photo identification and a HAVA document, moreover, is not justified by any governmental interest. Plaintiffs are not aware of anything (whether cited by the North Carolina General Assembly or otherwise) indicating that requiring both forms of documentation avoids registration and voting by ineligible individuals, or furthers any other valid government interest.

57. S.B. 747 §10.(a) also requires that a same-day registrant's application to register to vote be rejected, and his or her ballot be retrieved and discarded, if a single verification notice sent to the registrant's address is returned by the U.S. Postal Service as undeliverable. Hence, if a county board of elections makes a mistake in addressing a verification notice, or if the Postal Service makes a mistake in attempting to deliver the notice, the same-day registrant's ballot will not be counted and the registrant will be

---

[11] https://www.pewresearch.org/social-trends/2022/03/24/the-demographics-of-multigenerational-households/ (visited October 10, 2023).

Case 1:23-cv-00862   Document 1   Filed 10/10/23   Page 20 of 37

disenfranchised, which is the most serious burden on the right to vote. Indeed, there are several reasons why mail may be returned to the sender as undeliverable.[12] And the Postal Service unquestionably make mistakes. One study found, for instance, that the Postal Service is responsible for nearly a quarter of failures to deliver mail deemed "undeliverable as addressed." Strategies for Reducing Undeliverable as Addressed Mail at 1.[13] S.B. 747's single-verification-notice provision for same-day registrants is not justified by any governmental interest. Again, plaintiffs are not aware of anything indicating that sending same-day registrants only a single verification notice (rather than two) avoids registration and voting by ineligible individuals, or furthers any other valid government interest.

58. S.B. 747 §10.(a) does not permit a same-day registrant to appeal any adverse determination about registration to the county board of elections. Accordingly, if there is an improper denial of a same-day registrant's application, an eligible voter will be unable to vote, which is the most serious burden on the right to vote. S.B. 747's lack of an appeals process for same-day registrants is not justified by any governmental interest. Once more, plaintiffs are not aware of anything indicating that the lack of an appeals process avoids registration and voting by ineligible individuals, or furthers any other valid government interest.

---

[12] https://pe.usps.com/text/dmm300/507.htm (visited October 10, 2023).

[13] https://www.uspsoig.gov/sites/default/files/reports/2023-01/ms-ma-15-006.pdf (visited October 10, 2023).

59.     *Second*, S.B. 747 §35 imposes a significant burden on the right to vote by requiring absentee ballots to be received by 7:30 p.m. (or whenever all polls in a particular county close) on election day in order to be counted.  Before S.B. 747, absentee ballots were accepted in North Carolina as long as they were *postmarked* by election day and received by 5:00 p.m. three days *after* election day.  S.B. 747 therefore burdens the right to vote by reducing the window in which people can cast a ballot by mail—and deprives people of the right to vote even where the delay in receipt of their absentee ballot is the result of circumstances entirely beyond their control.  For example, in fall 2020, the U.S. Postal Service failed to deliver letters and other flat mail nearly 20 percent of the time.  *See* Nationwide Service Performance at 7.[14]  Although delays have lessened somewhat since then, they persist:  Nearly 10 percent of first-class mail, for example, was not delivered on time between July and September 2023.  *See* U.S. Postal Service Press Release.[15]

60.     No sufficiently weighty state interest justifies S.B. 747's burden on voting by mail, an option that has long been used by many North Carolina voters.  The burden assuredly cannot be justified as necessary to enable county boards to process the ballots for canvassing, because S.B. 747 §15 *expands* the window of time for challenging

---

[14] https://www.uspsoig.gov/sites/default/files/reports/2023-01/21-120-R21.pdf (visited October 10, 2023).

[15] https://about.usps.com/newsroom/national-releases/2023/0922-postal-service-delivery-performance-continues-to-average-2.5-days.htm (visited October 10, 2023).

Case 1:23-cv-00862   Document 1   Filed 10/10/23   Page 22 of 37

absentee ballots so that challenges may now be made until 5:00 p.m. on the fifth business day after election day.

61.     *Third*, S.B. 747's poll-observer provisions burden the right to vote in North Carolina, in several ways.

62.     S.B. 747 §7.(a)-(b) imposes a significant burden on the right to vote by permitting poll observers to engage in intrusive activities in voting places.  For instance, observers may now move freely about voting enclosures, potentially allowing them to get uncomfortably close to voters as they engage in the act of voting itself.  This intrusiveness will no doubt be disconcerting to many voters, some of whom will choose not vote at all.  There is no valid justification for this burden.

63.     S.B. 747 §7.(a)-(b) also imposes a significant burden on the right to vote, by establishing vague standards governing the conduct of poll observers.  For example, the law states that poll observers may engage in certain activities, provided that they "do[] not interfere with the privacy of any voter."  S.B. 747 §7.(b) (to be codified at N.C. Gen. Stat. §163-45.1(g)).  Under that provision, it is not clear when a poll observer crosses the line from acceptable conduct to an unacceptable invasion of privacy.  The state has no legitimate interest in S.B. 747's vague standards, and certainly no interest that justifies the burden of those vague standards on North Carolinians' right to vote.

64.     Unless enjoined, defendants will unconstitutionally burden North Carolinians' right to vote under the First and Fourteenth Amendments by implementing and enforcing the challenged provisions of S.B. 747.

**Count II: Violation of the Fourteenth Amendment to the United States Constitution – Procedural Due Process**

65.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

66.     Due process prohibits states from depriving "any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, §1.  A state thus may not deny a constitutionally protected liberty interest without adequate procedural protections.

67.     To succeed on a procedural-due-process claim, a plaintiff must show: "(1) a cognizable liberty interest or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate."  *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011) (quotation marks omitted).  On the last element, procedures are typically inadequate if they do not provide "notice and an opportunity to be heard."  *Wolf v. Fauquier County Board of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009); *see also Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).

68.     To assess the adequacy of procedural protections, courts examine three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).[16]

---

[16] "Multiple district courts … have considered procedural due process challenges to election regulations under ordinary procedural due process principles," i.e., the

69.     S.B. 747 violates procedural due process by not giving same-day registrants notice and an opportunity to be heard when their applications are rejected and their votes consequently discarded.

70.     Under S.B. 747, an individual may register and vote on the same day during early voting by filling out the necessary form, providing proof of residence, and presenting a photo ID.  S.B. 747 is silent, however, as to how any disputes over the acceptability of the applicant's documentation should be resolved, meaning that any election official could unilaterally deny a person his or her right to vote without due process.  Moreover, under S.B. 747 §10.(a), a same-day registrant's "vote shall be counted unless the county board determines that the applicant is not qualified to vote." But S.B. 747 does not prescribe a mechanism for notifying a same-day registrant of an adverse determination by a board, despite the substantial risk that such adverse determinations could be erroneous.  Nor does S.B. 747 provide any opportunity for the same-day registrant to be heard on any disputes over any adverse determinations.

71.     S.B. 747 also violates procedural due process, both by failing to provide adequate procedures to verify a same-day registrant's address and by failing to provide any notice when a same-day registrant's address is not confirmed (via a single mailing).

---

*Mathews* factors.  *Arizona Democratic Party v. Hobbs*, 485 F.Supp.3d 1073, 1093 (D. Ariz. 2020) (collecting cases); *see also Democracy North Carolina v. North Carolina State Board of Elections*, 476 F.Supp.3d 158, 228-229 (M.D.N.C. 2020) (applying the *Mathews* factors for a procedural-due-process claim against a North Carolina law governing absentee ballots).  But S.B. 747 would be unconstitutional even if a procedural-due-process claim were assessed instead under the *Anderson-Burdick* framework.  *See supra* ¶¶52-64.

- 25 -

Under the statute, a county board of elections cannot register a same-day registrant and must discard the registrant's retrievable ballot if the U.S. Postal Service returns as undeliverable a single verification notice sent to the address the registrant provided. A single error by the county board in preparing the mailing, or a single error by the Postal Service in processing the mailing, therefore, could mean that a valid vote is discarded, i.e., that an eligible voter's fundamental right to vote is denied. As mentioned above, such errors by the Postal Service occur frequently. *See supra* n.13. North Carolina has identified no reason why same-day registrants should be provided only one verification notice by mail, especially considering that two verification notices must be returned as undeliverable before all other registrants can be deemed ineligible to vote. N.C. Gen. Stat. §163-82.7(e)-(f). Moreover, when a county board determines that a same-day registrant should not be registered based on the purported undeliverability of a single verification notice, S.B. 747 does not establish any procedure for attempting to notify the same-day registrant of that adverse determination so that he or she can be heard on the matter.

72.     Application of the three *Mathews* factors confirms that S.B. 747 violates procedural due process.

73.     *First*, the private interest affected by S.B. 747's same-day-registration provisions is extremely strong. As noted at the outset of this complaint, voting is a "fundamental political right, preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The right to vote is also "a constitutionally protected liberty interest."

*Democracy North Carolina*, 476 F.Supp.3d at 227 (citing *Burdick*, 504 U.S. at 433).

That right "may not be confiscated without due process." *Raetzel v. Parks/Bellemont*

*Absentee Election Board*, 762 F.Supp. 1354, 1356 (D. Ariz. 1990).

74.     *Second*, S.B. 747's same-day-registration provisions create a high risk of

wrongly barring voters from registering, voting early, or participating in elections.

Additional procedural protections would greatly reduce this risk.  Such protections

include: (1) a requirement that two verification notices be returned as undeliverable

before any registration application is rejected and the corresponding ballot is retrieved

and discarded, and (2) a requirement that voters be given notice and meaningful

opportunities to be heard within sufficient time to remedy any incorrect rejections of

applications for registration and retrieval and discarding of ballots.

75.     *Third*, although the government has an interest in preventing ineligible

people from voting, it would not undermine that interest for North Carolina to provide

additional procedural protections.  In other words, additional procedural protections

would not allow voting by those who are ineligible.  Nor would they be unduly

burdensome.  For example, S.B. 747 provides an opportunity to be heard when anyone in

the same county as a registered voter challenges the voter's ability to vote in that election.

S.B. 747 §13.(b) (to be codified at N.C. Gen. Stat. §163-88).  It also leaves intact the

requirement that two verification notices be returned as undeliverable before any non-

same-day registrant's application can be rejected.  N.C. Gen. Stat. §163-82.7(e).  And it

preserves the voter's opportunity to be heard on challenges to absentee ballots, even

while extending the time for such challenges until five business days after election day. S.B. 747 §15 (extension to be codified at N.C. Gen. Stat. §163-89(a), without altering the existing right to be heard codified at N.C. Gen. Stat. §163-89(e)).

76. In short, application of the *Mathews* factors confirms what common sense suggests: Due process is "not provided when … election procedures do not give some form of post-deprivation notice to the affected individual so that any defect in eligibility can be cured and the individual is not continually and repeatedly denied so fundamental a right." *Raetzel*, 762 F.Supp. at 1358. S.B. 747's new procedures for same-day registrants are therefore unconstitutional.

77. Unless enjoined, defendants will violate North Carolina voters' Fourteenth Amendment procedural-due-process rights by implementing and enforcing the challenged provisions of S.B. 747.

**Count III: Violation of Article I, Section 19 of the North Carolina Constitution – Law of the Land**

78. Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

79. Under the North Carolina Constitution, "[n]o person shall be … in any manner deprived of his life, liberty or property, but by the law of the land." N.C. Const. art. I, §19. "The term 'law of the land' … is synonymous with 'due process of law' as used in the Fourteenth Amendment to the Federal Constitution." *In re Moore*, 221 S.E.2d 307, 309 (N.C. 1976), *quoted in Rhyne v. K-Mart Corp.*, 594 S.E.2d 1, 15 (N.C. 2004). Although the Law of the Land Clause provides at least as much protection as the federal Due Process Clause, the former may warrant "'relief against unreasonable and arbitrary

state statutes in circumstances where relief might not be obtainable'" under the latter. *North Carolina v. Bryant*, 614 S.E.2d 479, 485 (N.C. 2005).

80.     For the reasons explained in paragraphs 65-77, S.B. 747 violates North Carolina's Law of the Land Clause.  The statute establishes procedures for same-day registration that lack any mechanism for an individual to contest the rejection of his or her application to register based on allegedly inadequate documentation.  It also fails to ensure that a same-day registrant is notified or has an opportunity to be heard if a county board of elections determines that he or she is not qualified to vote.  And it impermissibly demands the rejection of a same-day registration—and the retrieval and discarding of a concomitant ballot—based on the undeliverability of only a single verification notice mailed by the county board to the registrant's home address.  Finally, S.B. 747 fails to provide any notice to a same-day registrant when his or her address cannot be confirmed based on the mailing of a single verification notice.

81.     Unless S.B. 747 is declared to be in violation of North Carolina law, defendants will violate article I, section 19 of the North Carolina Constitution by implementing and enforcing the statute's challenged provisions.

**Count IV: Violation of the Civil Rights Act, 52 U.S.C. §10101(a)(2)(A) – Applying Different Standards, Practices, or Procedures to Voters in a Single County**

82.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

83.     The Civil Rights Act states in part that:

> No person acting under color of law shall … in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or

> procedure different from the standards, practices, or
> procedures applied under such law or laws to other
> individuals within the same county, parish, or similar
> subdivision who have been found by State officials to be
> qualified to vote[.]

52 U.S.C. §10101(a)(2)(A).

84.     S.B. 747 requires officials to apply different standards, practices, or

procedures to different sets of individuals who are qualified under North Carolina law to

vote and who reside in the same county.

85.     *First*, the registration standard for same-day registrants under S.B. 747 is

different from the standard that applies to those who register and vote on different days

(i.e., non-same-day registrants).  Non-same-day registrants do not have to provide

supporting documentation in addition to photo identification in order to register, whereas

same-day registrants in the same county must provide *both* photo identification *and* a

HAVA document.  Thus, there is a heightened standard for same-day registrants to

register compared with others in the same county.

86.     *Second*, for non-same-day registrants, a registration form is rejected if the

U.S. Postal Service is unable to deliver two verification notices sent to the home address

provided on the registration form.  N.C. Gen. Stat. §163-82.7.  But for otherwise-identical

same-day registrants, registration is rejected if the Postal Service is unable to deliver only

one verification notice.  S.B. 747 §10.(a) (to be codified at N.C. Gen. Stat. §163-

82.6B(d)).  Again, then, there is a different standard for non-same-day registrants to

register than for same-day registrants to register within the same county.

- 30 -

87.    *Third*, when a county board of elections determines that a non-same-day registrant is not qualified to vote, it must send the individual a notice of denial of registration.  N.C. Gen. Stat. §163-82.7(b).  The person is then entitled to an appeal with a hearing before the county board, plus additional appeals to the North Carolina courts.  *Id.* §163-82.18(a)-(c).  For same-day registrants, however, S.B. 747 does not provide allegedly ineligible voters with notices of registration denials, nor does it establish a process for allegedly ineligible voters to appeal a county board's determinations.  Thus, the procedures for processing non-same-day registrations differ from the procedures for processing same-day registrations within the same county.

88.    Unless enjoined, defendants will violate 52 U.S.C. §10101(a)(2)(A) by implementing and enforcing S.B. 747 in a way that applies different voter-registration standards and procedures to different North Carolinians in a single county.

## Count V: Violation of the Help America Vote Act,
## 52 U.S.C. §21082 – Failure To Provide Any System To Track Provisional Ballots

89.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

90.    HAVA provides that:

> The appropriate State or local election official shall establish a free access system (such as a toll-free telephone number or an Internet website) that any individual who casts a provisional ballot may access to discover whether the vote of that individual was counted, and, if the vote was not counted, the reason that the vote was not counted.

Case 1:23-cv-00862   Document 1   Filed 10/10/23   Page 31 of 37

52 U.S.C. §21082(a)(5)(B).  When an individual casts a provisional ballot, the "election official shall give the individual written information" about the tracking system.  *Id.* §21082(a)(5)(A).

91.     S.B. 747 violates this provision of HAVA because it does not establish a free access system (such as a website or a toll-free phone number) allowing for the tracking of retrievable ballots, including whether retrievable ballots are counted and, if not, the reasons why they were discarded.  Because S.B. 747 does not establish such a tracking system, it also does not require election officials in North Carolina to provide written information about such a system to North Carolina voters.

92.     Unless enjoined, defendants will violate 52 U.S.C. §21082 by implementing and enforcing the challenged provisions of S.B. 747.

### Count VI: Violation of the Voting Rights Act, 52 U.S.C. §10307(b) – Intimidation of Voters by Poll Observers

93.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

94.     Section 11(b) of the Voting Rights Act provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote[.]

52 U.S.C. §10307(b).

95.     S.B. 747 violates this provision by allowing poll observers to roam freely around voting enclosures.  In light of this, voters will face the intimidating prospect of

- 32 -

managing offensive conduct by unconstrained poll observers, with little clarity as to when and how lines of prohibited conduct may be crossed. This poll-observer conduct permitted by S.B. 747 is so intrusive that it is highly likely to intimidate voters.

96.    Unless enjoined, defendants will violate 52 U.S.C. §10307(b) and/or increase violations of that provision by third parties by implementing and enforcing the challenged provisions of S.B. 747.

### Count VII: Violation of Article I, Section 10 of the North Carolina Constitution – Free Elections

97.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

98.    The North Carolina Constitution guarantees that "[a]ll elections shall be free." N.C. Const. art. I, §10. This Free Elections Clause emphasizes that the right to vote is fundamental: "Our government," the state's highest court has explained, "is founded on the consent of the governed. A free ballot and a fair count *must* be held inviolable to preserve our democracy." *Swaringen v. Poplin*, 191 S.E. 746, 747 (N.C. 1937) (emphasis added) (citing the Free Elections Clause). "[G]iving the provision its plan meaning, 'free' means 'free from interference or intimidation.'" *Harper v. Hall*, 886 S.E.2d 393, 432 (N.C. 2023). Thus, under the Free Elections Clause, voters must be "free to vote according to their consciences without interference or intimidation." *Id.* at 439.

99.    For the reasons explained in paragraphs 93-96, S.B. 747 violates North Carolina's Free Elections Clause. The statute subjects North Carolina voters to interference and intimidation by poll observers who may engage in intrusive conduct. By

- 33 -

interfering with the franchise in this manner, S.B. 747 prevents some North Carolina citizens from freely voting their consciences.

100.    Unless S.B. 747 is declared to be in violation of North Carolina law, defendants will violate article I, section 10 of the North Carolina Constitution by implementing and enforcing the challenged provisions of S.B. 747.

PRAYER FOR RELIEF

WHEREFORE, the DNC and NCDP request entry of a judgment:

a.    Declaring that the challenged provisions of North Carolina law, as amended by S.B. 747, violate the First and Fourteenth Amendments to the U.S. Constitution, article I of the North Carolina Constitution, the CRA, HAVA, and the VRA;

b.    Preliminarily and permanently enjoining defendants, their agents, successors in office, and all persons acting in concert with them from: (1) requiring same-day registrants to produce documentation that other registrants do not need to produce, (2) denying a same-day registrant's application to register without providing that individual with sufficient notice and an opportunity to be heard, (3) rejecting a same-day registrant's application to register based on the return of a single notice by the U.S. Postal Service as undeliverable, (4) refusing to include in the official vote totals any absentee ballots that are postmarked by election day and received after 7:30 p.m. on election day but before 5:00 p.m. three days after election day, (5) applying different voting-registration standards, practices, or procedures to different groups of individuals in the same county, (6) failing to provide a free access system by which same-day registrants

- 34 -

can track their retrievable ballots, and/or (7) permitting poll observers to intimidate, threaten, or coerce or to attempt to intimidate, threaten, or coerce voters;

c.      Directing defendants, their agents, successors in office, and all persons acting in concert with them to take any necessary and appropriate action to ensure that state, county, and local authorities who administer North Carolina's elections comply with this Court's orders;

d.      Ordering defendants to pay plaintiffs' reasonable attorney fees, including litigation expenses and costs, as allowed under 42 U.S.C. §1988 and any other applicable law; and

e.      Awarding plaintiffs such other and further relief as the Court deems just and proper.

## JURY-TRIAL DEMAND

Plaintiffs demand a jury trial on any and all issues so triable.

October 10, 2023

Respectfully submitted,

/s/ William A. Robertson
JIM W. PHILLIPS, JR.
N.C. Bar No. 12516
SHANA L. FULTON
N.C. Bar No. 27836
WILLIAM A. ROBERTSON
N.C. Bar No. 53589
JAMES W. WHALEN
N.C. Bar No. 58477
BROOKS, PIERCE, MCLENDON,
    HUMPHREY & LEONARD, LLP
150 Fayetteville Street
1700 Wells Fargo Capitol Center
Raleigh, N.C. 27601
Phone: (919) 839-0300
Fax: (919) 839-0304
jphillips@brookspierce.com
sfulton@brookspierce.com
wrobertson@brookspierce.com
jwhalen@brookspierce.com

SETH P. WAXMAN[*]
DANIEL S. VOLCHOK[*]
CHRISTOPHER E. BABBITT[*]
GARY M. FOX[*]
JOSEPH M. MEYER[*]
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
gary.fox@wilmerhale.com
joseph.meyer@wilmerhale.com

[*] Local Rule 83.1(d) special
appearance forthcoming.

- 36 -

Case 1:23-cv-00862   Document 1   Filed 10/10/23   Page 37 of 37