# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE; NORTH CAROLINA DEMOCRATIC PARTY<br><br>Plaintiffs,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§  Case No. 1:23-CV-862-TDS-JEP |

## INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

In their rush to declare that "North Carolina Senate Bill 747 ('S.B. 747') is a multi-pronged assault on the right to vote," Memorandum in Support of Motion for Preliminary Injunction, D.E. 7 ("Mot.") 1, Plaintiffs apparently did not read the new law or analyze its interaction with the previously enacted North Carolina election law, which it amends. Two of the three arguments Plaintiffs raise fail simply because Plaintiffs do not understand what they want enjoined. Plaintiffs attack a strawman law, and their invitation for this Court to

do the same should be rejected. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 293 (4th Cir. 2020) (explaining that an injunction founded on "factual" error is improper).

Plaintiffs say that S.B. 747 violates the Due Process Clause and the Help America Vote Act (HAVA) because the bill itself does not establish certain procedures required by these respective federal mandates. But North Carolina law already provides satisfactory procedures under both rubrics; S.B. 747 does not eliminate them; and Plaintiffs fail to show that, without an injunction, the 2024 elections will be conducted in violation of either HAVA or due process dictates. Plaintiffs' third contention, under the Civil Rights Act, affords that law such breadth that it would condemn the very same-day registration process Plaintiffs purport to defend. Plaintiffs are unlikely to prevail on any of the issues they raise because S.B. 747 does not violate the Due Process Clause, HAVA, or the Civil Rights Act.

Equitable principles independently foreclose Plaintiffs' request that the Court enjoin S.B. 747 before finding out what it contains. Their proposed injunction would have unpredictable and noxious results—beginning with the end of same-day registration. Equity calls for care and caution, and Plaintiffs' reckless approach does not serve its ends. On this basis alone, the motion should be denied.

## APPLICABLE LAW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In seeking injunctive relief, Plaintiffs bear the heavy burden of showing (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities weighs in their favor; and (4) a preliminary injunction is in the public's

2

interest. *Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

**ARGUMENT**

## I.      Plaintiffs Have Little Chance of Success on the Merits

The Democratic National Committee and North Carolina Democratic Party ("Plaintiffs") raise three of their seven causes of action in their Motion. *Compare* Mot. 9–22 (presenting Counts II, IV, and V) *with* Compl., D.E. 1, ¶¶ 52–100 (Counts I–VII). Plaintiffs have not shown likelihood of success on any cause of action they now present and have forfeited any reliance on the other counts at this stage. *United States v. Caldwell*, 7 F.4th 191, 212 n.16 (4th Cir. 2021) (deeming "arguments raised for the first time" in reply forfeited).

### A.      S.B. 747 Does Not Violate the Due Process Clause

Plaintiffs are unlikely to succeed on their procedural due process claim (Count II). *See* Mot. 9–16; Compl. ¶¶ 65–77. Plaintiffs misread North Carolina law, which provides the very notice and hearing opportunity that Plaintiffs say is required. Nor is there merit in Plaintiffs' apparent fallback position that the Due Process Clause requires two verification mailings rather than one. Due process principles do not speak to that policy choice, and in all events, the State's reasons for one mailing outweigh Plaintiffs' demands for two. Plaintiffs are therefore unlikely to succeed on Count II.

#### 1.      Same-Day Registrants Receive Adequate Notice and Opportunity to Challenge Denial of Registration

Plaintiffs are wrong to contend that S.B. 747 fails "to give same-day registrants notice and an opportunity to be heard when their applications are rejected." Mot. 9. This

contention hinges on their assertion that S.B. 747 §10.(a) "does not prescribe any mechanism for notifying a same-day registrant of an adverse determination of eligibility, let alone the grounds for such determination." Mot. 11. That misstates North Carolina law.

As Plaintiffs elsewhere acknowledge, *see* Mot. 4, North Carolina law requires county boards to "send, by certified mail, a notice of denial of registration" upon a determination that an applicant is not qualified to vote and to provide procedures (including a hearing) for applicants to challenge such determinations. G.S. 163-82.7(b). Adverse decisions are themselves appealable in North Carolina Superior Court. *Id.* § 163-82.18(c). Plaintiffs appear to agree that G.S. 163-82.7 is sufficient for due process purposes. *See* Mot. 4, 15. That is for good reason. "Procedural due process provides merely 'a guarantee of fair procedures—typically notice and an opportunity to be heard.'" *Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009) (citation omitted). That standard is satisfied under G.S. 163-82.7, which provides a notice, a hearing opportunity, and a right of appeal.

Plaintiffs' due process contention assumes that S.B. 747 §10.(a) does not provide the protections of G.S. 163-82.7. *See* Mot. 4–5, 9–11. But they never explain why they believe that to be so. They insist S.B. 747 "is silent as to how any disputes over the acceptability of an applicant's documentation should resolved." *Id.* at 11. But, even if that were true—and it is not—Plaintiffs do not explain why S.B. 747 needs to speak to that question when G.S. 163-82.7 already does. S.B. 747, after all, amends North Carolina election law; it does not subsume or replace all of it. And it does not repeal G.S. 163-82.7.

In fact, S.B. 747 is not silent. It expressly incorporates (with one modification) the procedures of G.S. 163-82.7 and thus provides the same notice, hearing, and appeal procedures Plaintiffs admit are sufficient. Specifically, S.B. 747 Section 10.(a) requires county boards of election to "*proceed under G.S. 163-82.7* to verify the applicant's address." §10.(a) (emphasis added). That process of verifying "the applicant's address," in turn, includes the full panoply of protections under G.S. 163-82.7. That is because the core action of G.S. 163.82.7 is "a determination that the applicant is [or is] not qualified to vote *at the address given*." G.S. 163-82.7(a)(1) and (2) (emphasis added). The subsequent notice, hearing, and appeal procedures are all part of the process of determining whether the applicant is qualified to vote at the applicant's stated address. Accordingly, the text of S.B. 747 §10.(a) is a clean fit for G.S. 163-82.7, including all protections Plaintiffs admit satisfy due process.

The text of S.B. 747 confirms this. Section 10.(a) modifies G.S. 163-82.7 in one respect, stating that "if the Postal Service returns the first notice [of address verification] *required under G.S. 163-82.7(c)* as undeliverable before the close of business on the business day before canvass, the county board shall not register the applicant . . . ." S.B. 747 §10.(a). There would be no purpose to modifying the notices "required under G.S. 163-82.7(c)," if the notice, hearing, and appeal processes of G.S. 163-82.7 were inapplicable. Plaintiffs' reading of S.B. 747 §10.(a) to incorporate less than all protections of G.S. 163-82.7 would render this phrase "superfluous and meaningless," in contravention of bedrock interpretive norms. *See Joyner v. Garrett*, 279 N.C. 226, 238, 182 S.E.2d 553,

561 (1971). The General Assembly clearly understood its dictates to be "required" under S.B. 747 §10.(a), and that text controls the inquiry.

Because of that unambiguous meaning, Plaintiffs have no chance of success on their lead due process claim. But even assuming ambiguity for the sake of argument, that would cut against Plaintiffs. They must "make a 'clear showing' of likelihood of success," and "ambiguity" does not cut it. *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292–93 (4th Cir. 2011). Moreover, any ambiguity would warrant *Pullman* abstention, which "is appropriate where there are unsettled questions of state law that may dispose of the case and avoid the need for deciding the constitutional question." *Meredith v. Talbot Cnty., Md.*, 828 F.2d 228, 231 (4th Cir. 1987). Here, there would be no basis to strike down S.B. 747 §10.(a) if it incorporates G.S. 163-82.7, and any ambiguity about the interplay between these provisions is a question of North Carolina law for the North Carolina courts. By consequence, abstention is the best Plaintiffs could get out of Count II, and preliminary relief is unwarranted where a court is likely to (and should) abstain on the merits under *Pullman*. *Wise v. Circosta*, 978 F.3d 93, 102 (4th Cir. 2020) (finding provisional injunctive relief inappropriate where *Pullman* abstention was likely).

### 2. Due Process Dictates Do Not Require Two Verification Mailings Rather Than One Mailing

That leaves only Plaintiffs' challenge to S.B. 747's modification of G.S. 163-82.7(c). *See* Mot. 11–13. As noted, S.B. 747 §10.(a) permits county boards to reject a same-day application and ballot "if the Postal Service returns the first notice required under G.S. 163-82.7(c) as undeliverable before the close of business on the business day before

canvass." S.B. 747 §10.(a). By comparison, other applications under G.S. 163-82.7 are tested by two verification mailings before an application is denied. G.S. 163-82.7(f). Plaintiffs' contention that due process requires two verification mailings rather than one lacks merit.

As an initial matter, this argument adds nothing to Plaintiffs' erroneous lead argument. Plaintiffs assert the reduction in verification mailings fails due process standards because "S.B. 747 establishes no procedure for attempting to notify the same-day registrant of that adverse determination so that he or she can be heard on the matter." Mot. at 13. But that is not true, for reasons explained. Plaintiffs also analyze these supposed failings together in the *Mathews* balancing test. *See id.* at 13–16. But G.S. 163-82.7(b) expressly provides for adequate procedures, *see* §I.A, *supra*, so Plaintiffs' suggestion that such a failing is compounded by the single-verification-mailing rule fails at its opening premise.

In all events, due process does not speak to the number of verification mailings a county board must send. Due process requires notice and opportunity to be heard, *Wolf*, 555 F.3d at 323, and North Carolina law provides that in ways described above—i.e., by affording same-day applicants notice if their registration is denied and opportunity to challenge that denial. The verification mailings under both S.B. 747 and G.S. 163-82.7 serve the separate purpose of testing applicants' stated addresses: "[i]f the Postal Service returns the [final] notice as undeliverable," the applicant's assertion of current address fails the test, and "the county board shall deny the application." G.S. 163-82.7(f). These mailings are orthogonal to the due process notice-and-opportunity standards; they relate to the State's compelling interest in ensuring verification of each applicant's address, which

is fundamental to determining a voter's eligibility. By impliedly admitting a two-verification-mailing system is lawful, Plaintiffs seem to concede this interest is compelling. And they do not explain why due process would be satisfied by two mailings but offended by one. They simply measure the single-mailing standard of S.B. 747 against their preferred two-delivery standard of G.S. 163-82.7(c). But they do not even attempt to explain why G.S. 163-82.7(c) allegedly sets the constitutional floor.

Plaintiffs' contentions are policy arguments, not constitutional arguments. Due process does not dictate any particular result; it only affords notice and an opportunity to be heard on the way there. *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002) ("[P]rocedural due process does not require certain results—it requires only fair and adequate procedural protections."); *see also Syngenta Crop Prot., Inc. v. U.S. E.P.A.*, 444 F. Supp. 2d 435, 446 (M.D.N.C. 2006) (noting that a complaint about alleged unfairness does not state due process claim when complainant has opportunity to be heard). Procedural due process dictates are agnostic as to whether one, two, or a dozen mailings returned undeliverable marks the correct line. *See, e.g.*, *Uzoechi v. Wilson*, No. CV JKB-16-3975, 2018 WL 2416113, at *10 (D. Md. May 29, 2018), *aff'd*, 735 F. App'x 65 (4th Cir. 2018) (in context of disciplinary hearing, when it comes to necessary quality and quantity of process, "there are few bright lines."). While an election law may violate due process if it does not provide voters whose applications are denied *any* notice and opportunity to be heard, *see Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 228 (M.D.N.C. 2020), Plaintiffs fail to tie the Due Process Clause to their challenge to the number of verification mailings required by SB 747.

For these reasons, North Carolina need not identify a "reason why same-day registrants should be mailed only one verification notice." Mot. 12. Regardless, North Carolina has compelling reasons for this distinction that satisfy due process balancing. *See Miranda v. Garland*, 34 F.4th 338, 358 (4th Cir. 2022) (factors). One factor is "the government's interest in using the current process, including the burdens it would incur in using additional or substitute process." *Id.* at 364. That interest here is compelling. An applicant utilizing same-day registration both registers and "then vote[s]" on the same date. S.B. 747 § 747 §10.(a)(a). The procedure is both a registration and a *voting* procedure, and county boards faced with processing a vote must determine whether to count it within a narrow time frame for delivering election results. The State has weighty reasons not to wait for more than one mailing to come back undeliverable—when the delay itself could result in the ballot not being counted.

The other factors are not likely at trial to be found to override this interest. The private interest here is not the right to vote, *see* Mot. 13, but the right to same-day registration with two (rather than one) verification mailing. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances."). But individuals desiring to vote and register in one stop must accept the limitations the State faces in administering that system, or else register in a different way (with two mailings). And the risk of deprivation is not "intolerably high." Mot. 14. S.B. 747 requires a verification mailing and then notice of denial of registration under G.S. 163-82.7 if registration is denied. That affords the "fair opportunity to rebut the Government's factual assertions" that Plaintiffs demand. Mot. 14

(quoting *Kirk v. Commissioner of Social Security Administration*, 987 F.3d 314, 325 (4th Cir. 2021)). Plaintiffs have no realistic prospect of success on Count II.

### B. S.B. 747 Does Not Violate the Help America Vote Act

Plaintiffs are also unlikely to succeed on their claim under the Help America Vote Act (HAVA) (Count V). *See* Mot. 19; Compl. ¶¶ 89–92. Plaintiffs' position fails for the same reason their due process claim fails: they misconstrue North Carolina law, which affords all the protections they say are required.

Plaintiffs' HAVA claim addresses one HAVA provision, which requires states to "establish a free access system (such as a toll-free telephone number or an Internet website) that any individual who casts a provisional ballot may access to discover whether the vote of that individual was counted, and, if the vote was not counted, the reason that the vote was not counted." 52 U.S.C. §21082(a)(5)(B). HAVA also provides that when an individual casts a provisional ballot, the "election official shall give the individual written information" about the tracking system. *Id.* §21082(a)(5)(A). Plaintiffs insist these requirements are not met because S.B. 747 does not establish systems meeting them. Mot. 11. But, again, this erroneously assumes anything not established in S.B. 747 does not exist.

North Carolina has had a HAVA-compliant system in place for years, the system is operational, and S.B. 747 does not abrogate it. North Carolina provides a state-of-the-art web application that allows voters to review their voting histories and learn whether their votes were counted. *See* N.C. State Board of Elections, *Your Voter Record*, https://www.ncsbe.gov/voting/your-voter-record (last visited Nov. 20, 2023). This site gives individuals the ability to, among other things, confirm their voter registration information

and polling place, determine the various districts they are assigned to based on their address, review sample ballots when available, learn about absentee ballot information, and obtain their voter history, including the status of provisional ballots. Further, there is a specific search tool to check the status of provisional ballots, *see* North Carolina State Board of Elections, *Provisional Search*, https://vt.ncsbe.gov/RegProvPIN/ (last visited Nov. 20, 2023), *and* a toll-free number to do the same, *see* North Carolina State Board of Elections, *Provisional Voting* https://www.ncsbe.gov/voting/provisional-voting (last visited Nov. 20, 2023). The most recent incarnation of this website was launched in advance of the 2020 election, *see* Exhibit A (press release announcing same), and S.B. 747 does nothing to change it. Thus, North Carolina provides multiple free methods for voters to track the status of their provisional ballots, which is all that 52 U.S.C. §21082(5)(B) requires. Plaintiffs do not address that system or contend that it fails HAVA's standards, and no such argument would be colorable. *See* 52 U.S.C.A. §21085 ("The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.").

Instead, Plaintiffs announce that "S.B. 747 fails to establish a tracking system," Mot. 19, but do not say why S.B. 747 itself must create HAVA-compliant systems when North Carolina achieved compliance by other means. Nor do Plaintiffs explain their basis for believing North Carolina will not apply its HAVA system to ballots cast within the framework of S.B. 747. As its formal title—An Act to Make Various Changes Regarding Elections Law—and text make clear, S.B. 747 amends North Carolina's election law, but does not repeal and replace it.

### C. S.B. 747 does not Violate the Civil Rights Act

Plaintiffs are unlikely to succeed on Count IV, which invokes the Civil Rights Act, 52 U.S.C. §10101. Mot. 16–17; Compl. ¶¶ 82–88. Plaintiffs again do not establish a basis for enforcing this statute, and the reading they afford it is so broad and contorted that it would render North Carolina's same-day registration procedure invalid in full. Congress did not intend that absurd result, and Plaintiffs are unlikely to establish a violation at trial.

### 1. Plaintiffs Are Unlikely To Establish a Right of Action

Plaintiffs are unlikely to show they have a private right of action to enforce their claims under 52 U.S.C. §10101(2). That is because this section of the Civil Rights Act "is enforceable by the Attorney General, not by private citizens." *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016) ("We have held that the negative implication of Congress's provision for enforcement by the Attorney General is that the statute does not permit private rights of action."). As noted, the question is whether "the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286. There is no remedy-creating language in 52 U.S.C. §10101, and the provision of remedies to the Attorney General, *id.* §10101(c), (d), and (e), forecloses a private remedy, *Alexander*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). Although courts are split on this question, *see Vote.Org v. Callanen*, 39 F.4th 297, 305 n.5 (5th Cir. 2022) (abstaining), Plaintiffs cannot show a clear entitlement to relief

in the face of that uncertainty.[1] And they certainly cannot show entitlement to relief by ignoring the issue in their opening brief. *Caldwell*, 7 F.4th at 212 n.16.

### 2. Plaintiffs Are Unlikely To Show a Civil Rights Act Violation

Plaintiffs are unlikely to show a violation of the Civil Rights Act on the merits. This is because, while 52 U.S.C. § 10101(2)(A) forbids applying differing standards to different "individuals" in the same county, Plaintiffs' Motion demonstrates, at most, that North Carolina applies different standards to different voting *processes* that are equally open to all voters. The Civil Rights Act forbids discrimination, not free choice and flexibility.

Specifically, the Civil Rights Act provides in relevant part that, "in determining whether any individual is qualified" to vote, officials may not "apply any standard, practice or procedure different" from those "applied . . . to other individuals within the same county . . . who have been found" qualified to vote. 52 U.S.C. §10101(2)(A). The key comparison is between "any individual" and "other individuals." The provision requires "the application of uniform standards, practices, and procedures to all persons seeking to vote in Federal elections," H.R. Rep. No. 88–914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2394, or, put differently, mandates that states "apply standards, practices, and procedures equally among individuals seeking to register to vote," *id.* at 2491.

This statutory text, however, cannot be read to forbid states from creating different means of establishing voter qualifications, which individuals may choose from in their sole

---

[1] The leading case finding a private right appeared to think 52 U.S.C. §10101 is part of the Voting Rights Act and relied on VRA cases that are not relevant to the Civil Rights Act. *See Schwier v. Cox*, 340 F.3d 1284, 1294–95 (11th Cir. 2003).

discretion, so long as those means are equally open to all individuals. Plaintiffs frame S.B. 747 as distinguishing between "two groups of individuals," which they call "same-day registrants and non-same-day registrants." Mot. 17. But people are not born as same-day and non-same-day registrants, and those categories are tied to nothing but the free choices such individuals make in deciding which of many equally open and available state processes they utilize. Put differently, any eligible North Carolina voter has the choice to become a "same-day registrant" or a "non-same-day registrant," and any registrant who opts for one option could have opted for the other. Thus, this is not a case where different standards are applied to individuals based on race, age, gender, neighborhood of residence, profession, etc. Each North Carolinian may choose how to establish their eligibility to vote, so there is no differentiation among individuals, only between equally available options.

Plaintiffs' position to the contrary "produces absurd results that Congress could not reasonably have intended." *United States v. Joshua*, 607 F.3d 379, 387 (4th Cir. 2010). Taken to its logical conclusion, Plaintiffs' interpretation of the Civil Rights Act would forbid many state efforts to expand voting opportunities or to afford more flexibility— because choice entails difference. For example, Plaintiffs' theory would appear to forbid North Carolina's same-day-registration process in its entirety. North Carolinians must typically register no later than 25 days before voting in an election, N.C.G.S. §163-82.6(d); *see* Mot. 3–4 (describing this process), but state law also creates same-day registration, formerly by enabling county boards to create "one-stop" voting sites where people may register and vote at the same time, N.C.G.S. §163-227.6, and now under S.B. 747 Section 10.(a). That is a different "standard, practice, or procedure" than the default

registration standard, 52 U.S.C. §10101(a)(2)(A), and would contravene the Civil Rights Act, as Plaintiffs read it. Likewise, even the prior North Carolina scheme Plaintiffs discuss favorably in their Motion asked for different forms of proof of eligibility. *Compare* Mot. 3 (applicant in default scheme "is not required to present any specific documentation verifying his or her eligibility") *with* Mot. 5 (applicant in one-stop scheme was "required to . . . provide one of several documents proving residence"). Under Plaintiffs' reasoning, North Carolina has been out of compliance with the Civil Rights Act for some time, unbeknownst to anyone.

That signals Plaintiffs have misconstrued the text. State law must apply different standards to different options because those options entail different needs. For example, North Carolina law enables individuals to present "a request for absentee ballots online using [certain] procedures . . . in lieu of the completed written request on a form established by the State Board." N.C.G.S. §163-230.3(a). According to Plaintiffs, because some individuals will choose the online procedure, and others the written form, the Civil Rights Act is offended—in which case online absentee-ballot requests are unlawful. Likewise, North Carolina regulations apply different procedures for voter identification at polling places than for absentee presentation. *Compare* 8 N.C. Admin. Code 17.0101 *with* 8 N.C. Admin. Code 17.0109. Plaintiffs' theory would effectively disable absentee voting by mandating that North Carolina accept *actual* identification for mail-in voting—the requirement for in-person voting—which is something voters typically cannot provide in the mail. Indeed, the very choice between mailing absentee ballots, 8 N.C. Admin. Code

18.0101(a), and returning them by hand, 8 N.C. Admin. Code 18.0102, violates Plaintiffs'

absurd Civil Rights Act theory.

The choices between mailing in a form or registering in person, doing so at a DMV

versus doing so at a public library, or showing a driver license versus showing a school

identification card all involve "different . . . standards, practices, or procedures." 52 U.S.C.

§10101(2)(A). But, in facilitating options and choice, states are not "*apply[ing]*" different

standards to different individuals. In this case, none of the supposed burdens of same-day

registration need apply in the least if applicants choose to register in a different way. Once

again, Plaintiffs fall far short of making a clear case on the merits, as S.B. 747 is entirely

consistent with the Civil Rights Act.

## II.     The Equitable Factors Do Not Favor Provisional Relief

Plaintiffs' motion fails on equitable grounds. They do not establish a likelihood of

irreparable harm absent injunction, that the balance of equities tips in their favor, or that an

injunction is in the public interest. *Winter*, 555 U.S. at 20. Because "all four requirements

must be satisfied," *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342,

346 (4th Cir. 2009), each failing independently forecloses provisional relief.

### A.     Plaintiffs Will Not Suffer Irreparable Injury Absent an Injunction

Plaintiffs' brief discussion of irreparable harm does not make out a clear showing

on this element. Mot. 20. Plaintiffs announce that "one or more" Democratic voters "will

be unlawfully prevented from voting or having their votes counted because of S.B. 747."

Mot. 20. But these assertions are only as good as their understanding of S.B. 747. As

explained, it provides notice, a hearing opportunity, and right of appeal, so if any voters

(Democratic or otherwise) are erroneously deemed ineligible, they will have recourse to a due process compliant process to correct errors. As to Plaintiffs' due process and HAVA claims, irreparable harm is implausible.

Meanwhile, Plaintiffs say nothing about the prospect of irreparable harm in relation to their Civil Rights Act claims. Even if they were correct that S.B. 747 contravenes the requirement of uniform standards, practices, and procedures, Plaintiffs do not show what harm is likely to befall them if the Court withholds relief until "a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (citation omitted). Without an injunction, all voters in North Carolina will have a choice of how to register and establish their registration. Any voter who considers the same-day-registration process problematic in any way can avoid irreparable harm by avoiding that process altogether.

Indeed, the effect of Plaintiffs' requested injunction is unclear and may harm them more than benefit them. *See* D.E. 6 at 2. They ask that North Carolina be barred from "applying different voting-registration standards, practices, or procedures to different individuals in the same county." *Id.* ¶ (4). As explained above, that dictate would bar the State from employing same-day registration at all, which is a different procedure from what many voters chose to utilize. Plaintiffs focus on the needs of "same-day registrants," Mot. 20, so an injunction that would end the category of same-day registrants can hardly benefit them. In any event, Plaintiffs bear a heavy burden, and their hand-waving does not meet it.

**B.      The Balance of Equities and Public Interest Cut Against an Injunction**

For a variety of reasons, the balance of equities and public interest militate against an injunction. To begin, Plaintiffs do not prove irreparable harm to themselves without an injunction. So there is no private harm personal to Plaintiffs to weigh in the balance.

On the other side of the balance is a mass of confusion the injunction Plaintiffs demand is likely to engender. In their haste to bring the instant motion, Plaintiffs did not adequately consider how an injunction would impact North Carolina election law or the practical administration of elections. Plaintiffs are incorrect in believing the Court is entitled to draft a new election code that meets Plaintiffs' own ideas of best election practices. *See* D.E. 6 at 2 (demanding, e.g., that "same-day registrants" not be required "to produce documentation that other registrants need not produce"). This Court's "responsibility is to interpret the laws . . . not rewrite them." *Miranda v. Garland*, 34 F.4th 338, 357 (4th Cir. 2022) ("our responsibility"); *Perez v. Ocean View Seafood Rest., Inc.*, 217 F. Supp. 3d 868, 876 (D.S.C. 2016) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."); *see Holder v. Humanitarian L. Project*, 561 U.S. 1, 17 (2010) (declining limiting construction that would "revise," not "interpret," statute being challenged). Accordingly, a valid injunction would operate like a sledgehammer, not a surgeon's scalpel. One necessary consequence of Plaintiffs' requested relief, as noted, is the end of same-day registration, full stop. Likewise, an injunction demanding "notice and meaningful opportunity to be heard" does nothing beyond what the law requires (and hence is non-justiciable), and—even if more were required—Plaintiffs do not specify what that is. *See* Fed. R. Civ. P. 65(d)(1)(C).

In these circumstances, the State's interests outweigh the harms Plaintiffs could conceivably show. Any time state law is enjoined, the state suffers irreparable harm. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). And the type of harm at issue here would be uniquely severe because Plaintiffs ask the Court to revise North Carolina's election law to unpredictable results. Considerations "specific to election cases" and the Court's "own institutional procedures" militate against injunctions that "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). That is a pronounced risk here. Plaintiffs rushed to Court without carefully reading S.B. 747 and ask for an injunction with an unknown scope as the 2024 elections are beginning. Election officials, candidates, campaigns, and voters will struggle to understand how the Court's injunction interplays with S.B. 747, and with the broader election code, to the result of inconsistent rules across the state, *see Bush v. Gore*, 531 U.S. 98 (2000), and the potential denial of voting opportunities, like same-day registration, that many voters prefer to utilize. For that reason, both the State's and public's interest—which subsumes the interests of voters (including Democratic voters)—weighs overridingly against an injunction.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion in its entirety.

Dated: November 20, 2023

Respectfully submitted,

**Chalmers, Adams, Backer & Kaufman, PLLC**

By:*/s/ Philip Thomas*
Philip R. Thomas
N.C. Bar No. 53751
204 N. Person St.
Raleigh, NC 27601
Telephone: 919-670-5185
Facsimile: 678-582-8910
pthomas@chalmersadams.com

**Baker & Hostetler LLP**

Tyler G. Doyle
Texas State Bar No. 24072075
Rachel Hooper
Texas State Bar No. 24039102
811 Main St., Suite 1100
Houston, TX 77002
Telephone: 713-751-1600
Facsimile: 713-751-1717
tgdoyle@bakerlaw.com
rhooper@bakerlaw.com

**Baker & Hostetler LLP**

Trevor M. Stanley
District of Columbia State Bar No. 991207
Richard Raile
District of Columbia State Bar No. 1015689
Washington Square
1050 Connecticut Ave. NW, Suite 1100
Washington, DC 20036
Telephone: 202-861-1500
Facsimile: 202-861-1783
tstanley@bakerlaw.com
rraile@bakerlaw.com

**Baker & Hostetler LLP**

Patrick T. Lewis (*pro hac vice pending*)
Ohio State Bar No. 0078314
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114
Telephone: 216-621-0200
Facsimile: 216-696-0740
plewis@bakerlaw.com

**ATTORNEYS FOR MOVANTS**

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), I hereby certify that this brief contains 5,170 words as counted by the word count feature of Microsoft Word.

**Chalmers, Adams, Backer & Kaufman, PLLC**

*/s/ Philip Thomas*
Philip R. Thomas
N.C. Bar No. 53751

## CERTIFICATE OF SERVICE

I hereby certify that I filed the forgoing document using the Court's CM/ECF System which will send notification to all counsel of record.

This 20th day of November, 2023.

**Chalmers, Adams, Backer & Kaufman, PLLC**

*/s/ Philip Thomas*
Philip R. Thomas
N.C. Bar No. 53751